IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ANJANA A. DOSSA,
        Plaintiff,

vs.

Case No. 06-1263-JTM

MICHAEL B. DONLEY,
  Secretary, Department of the Air Force,
        Defendant.

MEMORANDUM AND ORDER

      This is a discrimination action brought by plaintiff Anjana Dossa, relating to her former employment at McConnell Air Force Base in Wichita, Kansas. The matter is before the court on the defendant Air Force Secretary's Motion for Summary Judgment.

      Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In response to the defendant's Motion, plaintiff Dossa has submitted a responsive pleading that does not comply with substantive requirements of the law and the rules of this court. A party opposing a motion for summary judgment must supply admissible evidence showing the existence of a material factual controversy, and may not rely on mere conclusory opinions, allegations unsupported by specific facts, or speculation. Fed.R.Civ.Pr. 56(e). *See Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F. 3d 1193, 1199 (10th Cir. 2006). Specifically, a plaintiff in an employment action may not simply rely on her own subjective opinion disagreeing with the job performance judgment of his or her supervisor. *Lawson v. Potter*, 463 F. Supp. 2d 1270, 1279 fn. 8 (D. Kan. 2006). Affidavits in opposition to a motion for summary judgment are valid only to the extent that they rest on the personal knowledge of the affiant. Rule 56(e). D.Kan. Rule 7.6(a) provides that:

> All briefs and memoranda filed with the court must contain:
>
> (1) a statement of the nature of the matter before the court;
> (2) a concise statement of the facts, with each statement of fact supported by reference to the record;

      (3)  a statement of the question or questions presented; and

      (4)  the argument, which must refer to all statutes, rules, and authorities relied upon.

Further, local Rule 56.1(b)(1) provides:

> A memorandum in opposition to a motion for summary judgment must begin with a section containing a concise statement of material facts as to which the party contends a genuine issue exists. Each fact in dispute must be numbered by paragraph, refer with particularity to those portions of the record upon which the opposing party relies, and, if applicable, state the number of movant's fact that is disputed.

The body of the Response contains no statement of the authorities relied upon. Indeed the Response contains no citations to any authorities at all, and is merely counsel's summary of the statements advanced by Dossa in two attached affidavits. In the first affidavit, Dossa reviews the defendant's Statement of Facts, controverting or admitting various facts. In the second, she sets forth additional recommended findings of fact. Although these affidavits refer throughout to Dossa in the third person, both affidavits are signed by Dossa rather than counsel.

These submissions fail to comply with counsel's obligations to either his client or this court. Only an attorney is qualified to render an effective evaluation of the evidence in the case in response to a motion for summary judgment. This evaluation requires the use of the attorney's professional judgment as to which factual contentions are material and controverted, and that judgment cannot be simply delegated to the client.

The court cannot rely on much of the information supplied in Dossa's affidavits. First, many of the denials are not based on her personal knowledge of objective facts, but on her subjective impression of the motives of other persons. Second, the affidavits are contradictory. They contradict the prior rulings of this court, which has denied plaintiff's nondiscrimination claims and held that the defendant followed necessary procedures in implementing corrective action against Dossa. They also contradict Dossa's own prior testimony, where she acknowledged the existence of job-related difficulties. (Tr. 2256-2260). And they were internally inconsistent. Dossa argues generally that she was doing her job well, but she also specifically admits facts such as those contained in defendants Statement of Fact ¶ 42 and 43, which reflect her failure to perform her job adequately. At one point,

Dossa argues that her work situation was generating "a deterioration in her physical and emotional health," at another, she denies suffering any stress from her job. (Cf. Plf. Fact ¶ 36 with Plf. Resp. to Def. ¶ 15). In addition, much of the material presented by Dossa is immaterial to the current issues in the case, or simply repeats other facts presented by the defendant. Accordingly, the court incorporates materials from Dossa's affidavits only where the information is relevant and admissible.

From October 1999, the date of initial hire until June 2004, the time of termination, Ms. Anjana A. Dossa held the supervisory position, Chief, Engineering Flight, GS-13, at the Air Force's 22nd Air Reserve Wing, McConnell Air Force Base, in Wichita, Kansas.

James M. Condon was employed at McConnell as the deputy base civil engineer for the civil engineering squadron during the pertinent time period.

The 22nd Air Reserve Wing was comprised of squadrons, one of which was the civil engineering squadron. The civil engineering squadron's function is to do the planning, programming, design, construction, and management of all projects, as well as do operations and maintenance of the Base's facilities through in-house work forces. There are eight flights or departments within the civil engineering squadron. The civil engineering squadron had a commander and a deputy. Aside from the Engineering Flight, the civil engineering squadron was comprised of the Operations Flight, Fire Department, Housing Flight, Resources Flight, Environmental Flight, Readiness Flight and Explosive Ordinance Disposal Flight.

As the Engineering Flight Chief, Dossa supervised subordinate supervisors, who were identified as Element Chiefs. These Element Chiefs included a Programming Chief, Design and Construction Chief, and SABER Chief. Dossa had direct supervisory authority over her Element Chiefs. Those Element Chiefs had supervisory authority over the employees assigned to each element. There were approximately twenty-five civilian and military employees comprising the Engineering Flight. Dossa relied on Element Chiefs who, in turn, relied upon the engineers and

other staff, to meet performance expectations, project deadlines and other goals and objectives.

James Condon, as deputy base civil engineer at the Base, made the decision to select Dossa as a supervisory general engineer, to be the Engineering Flight Chief, and to begin employment in November 1999. Condon served as Dossa's first level supervisor. Lt. Col. Charles Emmette, base civil engineer, served as her second level supervisor.

Condon laid out a performance plan for Dossa in January 2000 just after she began her employment. The performance plan was essentially the same plan as the plan provided to Dossa's predecessor from 1985 until Dossa was hired. He reviewed what he expected from Dossa regarding the management of her flight. This review was repeated annually.

According to Dossa, she realized at the outset that the Engineering Flight was operating in a less than efficient manner. Before Dossa was hired, there had been no regular or weekly meetings of the flight personnel, staff communicated verbally, rather than through email or other written means. Communication of electronic information was accomplished through disks, rather than through networking. Dossa made dramatic changes in the way business was conducted in the Engineering Flight. Dossa conducted staff meetings once a week to encourage face-to-face communication in a group setting. The meetings had structure, agenda and direction.

For the first three years as Flight Chief, Dossa enjoyed good performance ratings and recognition by her supervisor as an excellent leader. In fact, in the interim performance assessment that Dossa received for the period April 1, 2002, to November 26, 2002, her rating official, Condon, recognized her as an outstanding manager who noted that she had been faced with an extremely heavy workload and, at the same time, experienced several key civilian vacancies and military deployments. Condon complimented Dossa on meeting challenges with professionalism and skill. (Def's Ex. A 59, 288; Def's Ex. B, 56). As a rule, the Engineering Flight had a heavier workload than any of the other flights in the squadron. (Pl's Ex. A, 246).

In her affidavit, Dossa states that "[d]uring her tenure, Dossa was a conscientious and competent supervisor." (Pl. Fact ¶ 34). She cites in particular favorable reviews by Lt Col. Pare, but Pare left the base in 2001, before the workload increase and Dossa's poor performance. Dossa alleges (*id*. at ¶ 46) that Lt. Col. Emmette's statements "smacked of discriminatory animus," but she makes no showing of any such animus, beyond communications showing that Emmette vigorously denied Dossa's claims of national origin discrimination.

In 2002, Condon noted a deterioration in Dossa's management skills. She had problems with communication and passing information to her subordinates and to other flights. She lacked leadership over her flight, failed to prioritize efforts for her flight and failed to exercise quality control. Products were often incomplete, inaccurate, and of poor quality. Condon discussed these problems with Dossa. He would often rewrite the product himself and send it back to Dossa for reassignment to show her how it should be done.

Lt. Col. Emmette was assigned to the Base from June 2001 as the Civil Engineer Squadron Commander, and Dossa served as the Engineer Flight Chief during his tenure. Lt. Col. Emmette thought Dossa was gifted and intelligent, but he also noted that she lacked management ability, especially regarding her interpersonal skills. Lt. Col. Emmette met with Dossa in an attempt to help her improve communication skills that would be conducive to an effective, efficient flight.

Both Condon and Lt. Col. Emmette would explain to Dossa step by step how to coordinate a project. Both Condon and Emmette testified that after these counseling sessions, Dossa's performance would improve for awhile, but then would start deteriorating again. Eventually, periods of improvement became shorter and shorter.

In early 2002, Condon and Lt. Col. Emmette met with Krista Jackson, Human Resources Officer for civilians at the Base. Jackson has held this position for thirteen years and her duties include giving advice to management on employee issues. Condon and Lt. Col. Emmette told Jackson they were concerned that Dossa was unable to keep up with her work and stress of her job.

Jackson provided a list of things to do to help Dossa become a success. This included training and meeting with Dossa every two weeks to give additional guidance. Condon, as required, provided Jackson with documentation that the training and additional feedback sessions had been provided. Proof that these steps have been taken must be provided before any further action can be taken regarding an employee's job performance.

During these sessions in which Condon provided guidance, Dossa continued to blame other workers on any issue that was brought up. She would point to a subordinate, peer, or another squadron. She put the focus on others and would not accept responsibility.

In early 2003, Condon continued to have increasing concerns and problems related to Dossa's poor performance and significant problems with complaints from her subordinates, peers, and other organizations on base. He wrote a February 4, 2003, memo setting forth these problems.

Dossa complains (Pl. Fact ¶ 19) that she did not receive a copy of the February 4 memo when it was written, and suggests that the memo actually shows that Condon agreed that the problem was poor communications skills by Dossa's subordinates. There is nothing to show that the specific matters contained in the memo are incorrect simply because of *when* Dossa saw them. Further, the actual memo indicates that Condon believed both Dossa and her subordinates were poor communicators.

Lt. Col. Emmette also continued to be concerned about Dossa's quality of work, delegation skills, and failure to meet assigned dates.

With Lt. Col. Emmette's input, Condon decided to begin more focused one-on-one assistance and counseling with Dossa. He also began to thoroughly document all counseling sessions and any performance problems that occurred. Condon's notes or diary entries consisted primarily of summaries of conversations that he had with Dossa. Dossa would have firsthand knowledge of these entries.

7

Lt. Col. Emmette and Condon had to take steps over and above their normal duties in order for the flight to meet its goals. They personally wrote and rewrote countless products that should have been done at Dossa's flight level. They attended meetings they would not normally attend to keep issues on track. They took many calls from the contracting squadron and from headquarters that normally should have been handled by Dossa. They had to work details of the base facility board meetings because Dossa was not effective. They had to rewrite a large volume of correspondence product from Dossa's civil engineering squadron.

Due to events following the 9/11 attacks, more money became available to the Base for projects. This resulted in an increase in the numbers of projects that could be awarded to the Base, and also increased the workload within Dossa's engineering squadron. Dossa's squadron was responsible for the preparation of programming documents that needed to be submitted by certain deadlines in order for the project to be included in the President's budget. These deadlines were driven by congressional action.

Management added engineering lieutenants, a retired civilian programmer, and a major from the national guard to assist with the workload in the engineering squadron. The workload did not make it impossible for Dossa to meet her expectations.

On May 15, 2003, Condon provided Dossa with a performance assessment for the period ending April 25, 2003. His assessment of her performance was dramatically lowered from the levels of her previous performance evaluations.

On August 20, 2003, Condon first became aware that Dossa had contacted the EEO Office when he received a call from EEO counselor, Correne Green.

Dossa's performance did not improve and on September 30, 2003, Condon provided Dossa with her mid-term feedback and indicated that if she did not show improvement she would be placed on a Performance Improvement Plan (PIP). When an employee is not performing acceptably, regulations require that they will be put on a PIP.

On or about October 15, 2003, Dossa filed a formal complaint of discrimination with the EEO. Dossa's written complaint to EEO on November 14, 2003, stated that her unsatisfactory performance appraisal was motivated by "discrimination, concerning working conditions, hostile work environment, and harassment" based on her national origin. (Dkt. 71, Exh. B at 5).

On October 24, 2003, Condon informed Dossa in writing that her performance was unacceptable in several critical aspects of her performance plan. Condon told Dossa that she was providing: 1) unacceptable, inaccurate products; 2) failing to meet deadlines; and 3) neither communicating with her subordinates nor providing them with proper guidance. Condon also explained what Dossa had to do to remain in the position. Condon completed an appraisal of Dossa's performance at the outset of the performance improvement period.

Dossa had been briefed on numerous occasions. what was expected of her in performing her job. She knew how she was failing to meet Condon's expectations. Furthermore, she knew at the beginning of the PIP what was expected of her to improve her performance in 90 days.

When Dossa's performance did not improve, Condon, as required, placed her on a Performance Improvement Plan. During the 90 day PIP, Condon met with Dossa every two weeks for documented, personalized performance feedback sessions. By implementing the PIP, Condon was trying to assist Dossa not to fail. The performance feedback was intended to offer Dossa guidance and assistance.

During the plan period, however, no progress was noted. Dossa took no responsibility for the problems or errors that occurred and were occurring within her flight. Instead, she continued to blame her subordinates, her peers, other organizations, and her supervisors for her problems. During her feedback sessions, Dossa's response to direction was repeatedly, "we shall see." (Dkt. 40, at 2245-48) Dossa complained that she was not receiving support from her subordinates, that they did not attend her meetings and that management implicitly encouraged this practice. Condon told Dossa to call her subordinates in and tell them what was expected. Condon continually reminded Dossa

that she had the authority to do that. There were no instances when Dossa actually reprimanded subordinates or took the necessary disciplinary action against them for their failure to do what was expected of them.

Dossa did admit that her flight was out of control and that she did not do anything to regain it. Instead, she stated that she kept to herself. At a time she needed to communicate with her staff, Dossa admits that she withdrew.

James Condon denies ever trying to sabotage Dossa's chances for improvement during the PIP. He did not keep her out of the loop in communications with subordinates. He kept her informed on all products and projects during that period.

When Dossa's performance did not improve, failing to meet five performance elements during the PIP, Condon issued a Notice on March 28, 2004, proposing her removal in compliance with 5 U.S.C. §4303.

In the proposed removal, Condon stated Dossa's performance deficiencies during the PIP under the Management Element as follows:

> DID NOT MEET. You are not managing the engineering flight effectively. You don't provide subordinates with necessary guidance and feedback to effectively and efficiently accomplish their tasks, nor are you overseeing timely accomplishment of work production milestones. I routinely return a large percentage of products to your flight due to errors, omissions, inaccuracies, etc. Products are returned for typos, grammar, incomplete and run together sentences. Many must be returned two and even three times. This indicates that you are not doing the review and quality control required of a flight chief, and, even more serious, you are not providing those preparing the products with the guidance and criteria essential for the proper preparation of the products. Most seriously, these products come to me for my signature or that of the Base Civil Engineer and headquarters containing incorrect data which could result in loss or delay of project funding or violating programming rules, etc. Your lack of proper management effort and lack of involvement in the BRAC process greatly impacted the squadron's ability to properly accomplish this critical project. More examples:
>
> > a. Input was required by 1200 on 23 Oct 03 for BCE [Base Civil Engineer] Seminar "Inside Info" but was received on 24 Oct 03 at 1236 only after I asked for your input again that morning.

> b. The Nov 03 MILCON submital was very poorly managed. Both the BC and I had to press you many times during the preparation process to complete the project. You did not meet the 7 Nov suspense to allow time for staffing and you didn't meet the AMC [Air Mobility Command] submittal suspense. I had to work the issue with HQ AMC to allow us to submit in parts due to this.
>
> c. You had a suspense of 31 Dec 03 for CE update to MSG/CC [Mission Support Group Commander] slides. When I inquired on 5 Jan, your response was, "Lt Ulrich was to send out." The slides were delivered later that day and were not ready for presentation. The BCE and I marked and returned them to you three times for correction and they were still being corrected on the date of the meeting.

Dossa admitted to the accuracy of the three examples of her performance deficiencies as summarized in paragraphs a, b, and c of the March 28, 2004, Notice of Proposed Removal.

Condon granted Dossa two extensions of time to respond to the proposed removal, but neither Dossa nor her representative, Dennis Friedman replied orally or in writing.

Condon testified that Dossa's national origin played no part in his decision to terminate her and that he was well aware of Dossa's national origin when he hired her, which Dossa also admits. No one ever complained to Condon that they had difficulty understanding the way Dossa spoke or that they had difficulty following instructions because English was not her first language.

Dossa's termination was effective June 18, 2004. Thereafter, she appealed her removal to the MSPB. After an evidentiary hearing, the MSPB rendered an Initial Decision affirming Dossa's termination.

Dossa then filed a petition with the EEO asking for review of the Order issued by the MSPB. On or about August 2, 2006, the EEO entered its Decision concurring with the Decision of the MSPB finding no discrimination.

Dossa commenced this action before the U.S. District Court for the District of Kansas (1) seeking appellate review of the MSPB decision affirming her termination, which has now been ruled

upon in the Court's Memorandum and Order, Dkt. 53, and (2) alleging that her termination was directly and causally related to reprisal for prior EEO activity and discrimination based on national origin (Indian).

*Conclusions of Law*

Dossa asserts that the defendant wrongfully terminated her based on her Indian origin. This court examines such claims under Title VII, and the burden-shifting framework that the Supreme Court set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973). *Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1249 (10th Cir. 2006). Initially, the plaintiff has the burden to establish a prima facie case of discrimination based upon her national origin. If she does, the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason for the adverse employment action. If the defendant makes this showing, the burden then shifts back to the plaintiff to show that the defendant's proffered justification is pretextual." *Id.* (citations omitted).

When establishing a prima facie case in a Title VII claim for wrongful termination, the court employs the three-part test that the Supreme Court established. *Martin v. Nannie & The Newborns, Inc.*, 3 F.3d 1410, 1416-1417 (10th Cir. 1993), *overruled on other grounds by Davidson v. Am. Online, Inc.*, 337 F.3d 1179 (10th Cir. 2003)*.*

> Initially, the plaintiff must show that (I) she belongs to a protected class; (ii) she was qualified and satisfactorily performing her job; and (iii) she was terminated under circumstances giving rise to an inference of discrimination. Once the plaintiff meets this burden, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the decision which adversely affected the employee. Once the defendant has set forth a facially nondiscriminatory reason for the decision, the 'factual inquiry proceeds to a new level of specificity. The plaintiff assumes the burden to prove that the employment decision was the result of intentional discrimination based on an impermissible motive. The plaintiff can prevail either directly by proving that the employer acted with a discriminatory motive or indirectly by showing that the stated reason for the discharge was a 'pretext for the sort of discrimination prohibited by [Title VII].'

*Id.* at 1417 (citations omitted).

Dossa belongs to a protected class because she is of Indian decent. She argues that she meets the second element, in that she was qualified for her position and was performing her job satisfactorily. However, there is disagreement between the plaintiff and defendant on whether the plaintiff was performing her job satisfactorily. It is uncontroverted that the plaintiff received good ratings the first three years as the Flight Chief. She also made dramatic changes in how the Engineering Flight was run. According to the plaintiff, she improved the electronic communications between the Flight and she conducted staff meetings once a week to encourage face-to-face communication in a group setting. She stated that the meetings had structure, agenda and direction.

However, for reasons discussed below, the court finds that Dossa has not presented a prima facie case of discrimination. In its prior Order, this court determined: that the defendant used the proper procedures and performance criteria in reviewing Dossa's work; that it provided feedback sessions to help her succeed; there was mismanagement in her department; that Dossa's removal was not arbitrary or capricious; and that her performance was not acceptable after the completion of the PIP. (Dkt. 53, at 4-5)

The evidence before the court establishes that Dossa began having ongoing problems with her work performance beginning in 2002, and has failed to show her job performance was satisfactory thereafter. Dossa has admitted that her flight was out of control. Condon stated that she had problems with communication and passing information to her subordinates and to other flights. She lacked leadership over her flight, failed to prioritize efforts for her flight and failed to exercise quality control. Products were often incomplete, inaccurate, and of poor quality. Condon discussed these problems with Dossa. He would often rewrite the product himself and send it back to Dossa for reassignment to show her how it should be done. Condon and Emmette, her other supervisor, conducted counseling sessions with Dossa; her work would improve for a while but then it would begin to deteriorate again, while the periods of improvement became shorter and shorter. Because the counseling sessions were not effective, Condon and Emmette met with Human Resources Officer

for civilians, Krista Jackson, to assist them in training Dossa. They gave Jackson feedback from these training sessions.

After Condon and Emmette exhausted all resources to assist Dossa in improving her job performance, they informed her she would be placed on a Performance Improvement Plan. During the 90 day PIP, Condon gave Dossa regular feedback. During the plan period, however, no progress was noted. Dossa took no responsibility for the problems or errors that occurred and were occurring within her flight, instead, blaming her subordinates, her peers, other organizations, and her supervisors for her problems. During her feedback sessions, plaintiff's response to Condon's direction was repeatedly, "we shall see." (Dkt. 40, at 2245-48).

In her affidavit, Dossa states that "[d]uring her tenure, Dossa was a conscientious and competent supervisor." (Pl. Fact ¶ 34). She cites in particular favorable reviews by Lt Col. Pare, but Pare left the base in 2001, before her workload increased and her performance ratings began to falter. She argues that she was never given Condon's February 4, 2003, memorandum setting forth the problems Dossa had been having with her subordinates "which specified poor communication skills." She admits to Condon noting that Dossa's subordinates had poor communication skills fails to acknowledge that Condon also target her poor communication skills. She also argues that the assertions Condon made about her job performance are not credible and that she "responded to Condon to a number of the written criticisms during the performance improvement period. . . . After Dossa received each counseling memorandum, she prepared responses which addressed, in depth, each issue raised." (Doc. 71, 2.)

Dossa admits facts which reflect her failure to perform her job adequately. Specifically she admits that on three separate occasions she failed to provide timely input, she failed to meet the November 7 suspense, and the slides due on December 31, 2003, had to be returned to her three times for correction. She admits the Base gave her two extensions of time to respond to the proposed removal and she never replied either orally or written. Dossa also contradicts herself in

how she was performing her job because she argues at one point that her work situation was generating "a deterioration in her physical and emotional health," and at another, she denies suffering any stress from her job. (*Cf.* Plf. Fact ¶ 36 with Plf. Resp. to Def. ¶ 15).

In addition to failing to demonstrate satisfactory job performance, Dossa has not shown that she was terminated under circumstances giving rise to an inference of discrimination. *Martin*, 3 F.3d at 1417. Dossa alleges that LTC Emmette's statements "smacked of discriminatory animus," but she makes no showing of any such animus, beyond communications showing that Emmette vigorously denied Dossa's claims of national origin discrimination. As noted previously, Condon first became aware that Dossa had contacted the EEO when he received a call from Correne Green on August 20, 2003. On or about October 15, 2003, Dossa filed a formal complaint of discrimination with the EEO. Plaintiff's written complaint to EEO on November 14, 2003 stated that her unsatisfactory performance appraisal was motivated by "discrimination, concerning working conditions, hostile work environment, and harassment" based on her national origin. (Dkt. 71, Exh. B at 5). She also asserted in her complaint that the discriminatory acts concerned

- working conditions;
- inequitable workload;
- undermining of her supervisory authority;
- encouraging subordinates, either implicitly or explicitly, to circumvent her supervisory authority;
- encouraging lack of support to her as a supervisor; and supporting an unpleasant and unprofessional work environment

(Dkt. 71-3, ¶ 25). She complained of not receiving adequate support during the PIP and that her supervisors "imposed unrealistic deadlines and was inflexible in its requirements imposed on the [plaintiff] in areas of communication and coordination. Management refused to entertain alternative acceptable methods of communication and coordination, such as emails, verbal communications, memos, meetings and reports." (*Id.* at ¶ 30).

Condon, who terminated Dossa, also hired her. Accordingly, the court infers that the defendant's stated reason for acting is not pretextual. *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006). This principle recognizes that, if an employer wanted to discriminate against the employee based on race or national origin, it would simply have chosen not to hire the employee in the first place. *Id*.; *see also Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1167 (10th Cir. 2007).

Dossa has failed to show circumstances which would create an inference of discrimination. She admits that Condon knew her national origin when he hired her and Condon maintains that he never discriminated against her based on her national origin. In addition, no one ever complained to Condon that they had difficulty understanding the way Dossa spoke or that they had difficulty following instructions because English was not her first language. Moreover, Dossa never brought any disciplinary action against any of her subordinates. Accordingly, the court will grant summary judgment on Dossa's discrimination claim.

Dossa also claims that the defendant retaliated against her once they found out she filed an EEO complaint. In order to demonstrate a prima facie case of retaliation, a plaintiff must show that "(1) she engaged in protected opposition to discrimination; (2) she suffered an adverse action that a reasonable employee would have found material; and (3) there is a causal nexus between her opposition and the employer's adverse action." *Antonio*, 458 at 1181.

> An employee 'may establish the causal connection by proffering evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.' But '[u]nless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation.'

*Id*. at 1181-82 (citations omitted). An inference of retaliation may arise from close timing between the protected action and the termination or adverse job action; a one and one-half month period is enough by itself to establish causation, but a three month period is not. *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir.2001).

16

Dossa's having filed the EEO complaint and her termination meet the first two elements of the test. However, Dossa has failed to show that her termination was caused by the filing of the EEO complaint. She attempts to do so by arguing that Condon began keeping a diary in February 2003, in which he wrote negative information that he did not share with Dossa. (Dkt. 71-3, ¶43). She also argues that he wrote in his diary that Dossa missed suspense dates but did not include specifics. She argues that Condon himself admitted to missing suspenses, because the Engineering Flight had missed suspenses. (Dkt. 71-3, ¶42). In a final attempt to establish causation, Dossa discusses two incidents when her supervisors had bypassed her in delegating tasks, (Doc. 71, 3-5), but does not cite to anything documenting these incidents.

The evidence cited is insufficient to create an inference of causation. First, Condon became aware that Dossa had contacted the EEO Office on August 20, 2003, when he received a call from an EEO counselor, and nearly ten months elapsed before her termination. Further, the fact that Condon began keeping notes on Dossa's performance in early 2003 (a fact highlighted by Dossa but hardly unusual for a manager dealing with an underperforming worker) further attenuates the probative value of any temporal inference, since it means that even more time, an additional five months, passed without a direct job action against the plaintiff. In light of such a delay, the timing of the termination itself will not support an inference of causation. Finally, the court finds that, even if Dossa had presented a prima facie case of discrimination or retaliation, summary judgment is still appropriate because the defendant has demonstrated the existence of a legitimate, non-pretextual reason for her termination. In this context, it is not relevant whether the decision to terminate Dossa was fair, wise, or even correct; the sole inquiry is whether the defendant's stated rationale is so incoherent, weak, or contradictory that a rational person could conclude that it is not worthy of belief. *See Cooper v. Wal-Mart Stores*, No. 07-2290, 2008 WL 4597226, *3 (10th Cir. Oct, 16. 2008).

The evidence shows that Condon found Dossa had not managed the engineering flight effectively, based on his personal observation of her performance. Condon unsuccessfully attempted

to improve Dossa's performance. Condon had hired Dossa, knowing of her national origin, and accordingly a strong inference arises against the presence of discriminatory intent. Further, the evidence fails to present any circumstances which would justify a finding that Condon was motivated by a discriminatory animus. In her Response, Dossa stresses her own subjective belief that she was performing her job adequately, but such evidence fails to demonstrate that Condon's conclusions were not advanced in good faith and free from illegal animus.

IT IS ACCORDINGLY ORDERED this 5th day of May, 2010, that the defendant's Motion for Summary Judgment (Dkt. 66) is hereby granted.

s/J. Thomas Marten
J. THOMAS MARTEN, JUDGE